JANUARY TERM, 1881, No. 237.          MARCH 20TH, 1882.

## Myers *versus* Brice *et al.*

1. Plaintiffs brought suit to recover a loss upon sales of goods of defendant, upon which they had made advances. The defence was, that the transaction between the parties was a sale and not a consignment. The plaintiffs offered in evidence receipts for the moneys, signed by the bookkeeper, who was the "business man" of the defendant, and to whom the payments were made. One of these receipts set forth that the money was an advance, and the other that it was an advance for goods consigned for sale on defendant's account. *Held,* that the receipts were admissible without proof of express authority to the bookkeeper to sign them in this form.

2. It was not competent for the defendant to prove by the bookkeeper that he executed the receipts in this form without authority.

3. The plaintiffs having given evidence by their agent, who contracted with the defendant, that the contract was one of consignment on advances, the defendant proposed to ask, in cross-examination, whether the witness had not said to plaintiffs that he had orders for goods of the kind at certain prices, and that the parties guaranteed these prices. *Held,* that it was immaterial.

4. The defendant further proposed to ask the witness whether, about a year after the making of the contract, he did not say to a clerk of the plaintiffs that he had bought goods of the defendant, that accounts of sales showed a loss, and that he would have to buy more goods in order to be in defendant's debt, and whether he did not admit that it was a sharp trick, to be followed by proof that he did buy more goods of defendant. *Held,* that it was immaterial.

5. A witness testified specifically as to the goods received and prices, but said, on cross-examination, "I have such knowledge of this as a principal would have of his general business. The books which I keep show the details of every transaction." *Held,* that it did not appear that his knowledge was derived from hearsay.

6. A witness identified copies of two bills of sale of the goods in question made out to the plaintiffs, each of which contained the line, "all claims must be made within three days' time," and testified that he took one of the bills to the plaintiffs' store before the money was paid, and gave it to a clerk, but was uncertain which bill he so delivered. The defendant, upon failure of the plaintiffs to produce the originals on call, offered the copies in evidence. *Held,* that, the testimony being in support of only one of them, the offer was properly overruled.

7. The defendant, having testified that the contract was one of sale, offered in evidence his books of original entry, showing the charges of the goods to the plaintiffs at the time of the transaction. *Held,* that, not being the best evidence, they were properly rejected.

8. The defendant, having testified that he knew nothing of the receipts, which were respectively dated October 7th and November 4th, 1874, until they were shown to him by a clerk of the plaintiffs in November, 1875, was asked by his counsel: "Did you then and there reject and repudiate them? What did you do?" *Held,* that the question was properly overruled.

9. The plaintiffs did not become insurers of the sales because of neglect to give defendant notice of the loss for a period of nine months, there being no evidence that any loss was incurred by reason of the neglect.

Before SHARSWOOD, C. J.; MERCUR, GORDON, PAXSON, TRUNKEY, STERRETT, and GREEN, JJ.

Error to the Court of Common Pleas, No. 3, for *Philadelphia County.*

Assumpsit by William Brice, John Allen, and Ephraim Brice, trading as Brice, Allen & Co., against Josiah B. Myers, to recover a drawback upon advances upon butter, shipped

[*Myers v. Brice et al.*]

to England, as alleged, through the plaintiffs on account of the defendant.

Upon the trial in the Court below, the plaintiffs called *C. H. Shoester,* who identified the following receipts:

"Received, Philadelphia, October 7th, 1874, of Messrs. Brice, Allen & Co. six hundred and ninety $\frac{40}{100}$ dollars as advance upon butter, ~~purchased~~ October 6th, 1874.

"$690$\frac{40}{100}$.

"J. B. MYERS,
"Per Kahoe."

"PHILADELPHIA, November 4th, 1874.

"Received from Brice, Allen & Co. proceeds of £180 sterling, say nine hundred and fifty-four dollars, being advance on 72 packages butter consigned to Watson, Dunn & Co. for sale on my account.

"$954. "J. B. MYERS,
"Per Kahoe."

And testified, *inter alia:*

"These receipts were signed by the bookkeeper of J. B. Myers, who was his business man. The goods were shipped to England, to Watson, Dunn & Co., on account of J. B. Myers. Account sales showing loss were sent from England, and were delivered to J. B. Myers. The first receipt, of October 7th, was written by Mr. Kahoe; the other was written by Mr. Thomas Hobson. I think Mr. E. Brice, Mr. Kahoe, and myself were present when the first receipt was signed. Mr. Hobson was present when the second receipt was signed. If the receipts had not been signed, we would not have advanced the money."

The counsel for plaintiffs offered the receipts in evidence.

Counsel for defendant objected, unless the authority of the bookkeeper to sign such qualified receipts is first proved.

The Court admitted the offer under exception. (First assignment of error.)

The witness continued:

"The butter went to England, to Watson, Dunn & Co., to be sold on account of J. B. Myers. Brice, Allen & Co. received account sales from Watson, Dunn & Co., when I cannot say. They were sent to J. B. Myers at same time with account current. November 23d, 1875, is the date of the account current. They were never returned, but were kept by Mr. Myers. We sent them shortly after we received them."

*Thomas Hobson,* for the plaintiff, testified, *inter alia:*

"In 1874 an arrangement was made between Brice, Allen & Co. and J. B. Myers for shipping butter on advances. Mr. Myers said he would take the risk of the English market and

[Myers *v.* Brice *et al.*]

make a shipment if he could get reasonable advances. He said that to me in his office. . . . . . That butter was shipped before advances were made or paid. It was taken to the steamship by Myers's own team. The market was very dull in England at the time, and here, too. I communicated with Mr. Myers almost daily. The English market was a subject of conversation frequently."

Upon cross-examination he said:

" Mr. Myers wanted to sell the butter. I had no orders, and didn't want to buy. Afterwards Mr. Myers said he would like to try the English market. He said, ' Get as good an advance as you can, and I will ship it.' . . . . . In the second conversation I did not guarantee the advances; didn't say there would be no drawbacks."

" Q. Did you not tell Brice, Allen & Co., the plaintiffs in this case, that you had orders from the other side (meaning from England) for butter, cheese, and produce, at certain prices, and that the parties on the other side guaranteed these prices, or words to that effect ?"

Objected to, and objection sustained under exception. (Second assignment of error.)

" Q. Did not Frederick M. Allen on one occasion, some time about the early part of November, 1875, on your going through his office, ask you why the firm had been so disagreeable all day, if it had anything to do with the English losses coming in, and did you not reply, ' Yes, it has ?' And did you not further say, ' I bought butter to ship to England and guaranteed a price, and account sales have come in with a heavy loss, showing sales at a less price than I guaranteed. Now I have to go to these parties whom I bought butter off of and buy more in order that we may be in their debt, for if we don't we will never get a cent, and we will have to settle the loss ourselves ?' Did he not ask you if you did not think that a sharp trick, and did you not reply, ' Yes, but it would work'? Did you not tell Allen that the defendant, J. B. Myers, was one of those to whom you had guaranteed advances ?"

Said question to be followed by proof that more butter was then bought of Myers, namely, $281 worth, set off in this case.

The question was objected to on ground that nothing this witness could say or do could change in any way the terms of the original contract. The objection was sustained as to all of the question except as to whether he said he had guaranteed advances. The defendant excepted. (Third assignment of error.)

" There was no direct charge to Mr. Myers. Myers said, ' Very well; pay commissions on return from other house.,

[Myers *v.* Brice *et al.*]

That was all Brice, Allen & Co. would get on the whole transaction."

*Alfred W. Dunn,* for the plaintiff, testified by deposition, *inter alia:*

"I reside in Liverpool, England. My firm's name is Watson, Dunn & Co.

"Q. State whether you received any butter from Brice, Allen & Co., shipped on account of Mr. Myers. If so, when and what amounts?"

Objected to generally and on ground of immateriality.

"A. We did. It was shipped on October 7th, 1874."

Objected to unless in his own knowledge.

The objection was overruled, and defendant excepted. (Fourth assignment of error.)

Witness: "It was received by our firm on or about October 21st, 1874,—forty-three packages of butter, marked 'S. P.' The second lot, seventy-two packages of butter, composed of fifty-seven tubs and fifteen kegs, shipped November 2d, 1874, received by our firm on or about November 15th, 1874. We found a sale for the first lot August 20th, 1875, and on the second lot February 10th, 1875. We were unable to sell it sooner and for a better price, partly from the depressed state of the market and absence of demand, and partly from the secondary quality of the butter."

Upon cross-examination he testified:

"Q. All these goods were consigned in the name of Brice, Allen & Co., were they not?

"A. I cannot remember, but such was the arrangement between us.

"Q. To whom do you credit the proceeds?

"A. To Brice, Allen & Co.

"Q. Were you ever informed of the names of the parties for whom Brice, Allen & Co were acting?

"A. [I cannot remember, but my impression is———."]

Objected to by Mr. Wetherill.

Witness resumes: ["My impression is that the butter belonged to Mr. J. B. Myers.] I have such knowledge of this as a principal would have of his general business. The books which I keep show the details of every transaction."

The objection was sustained as to the part in brackets.

"Q. Do you mean to say that the books you keep show that these two packages, shipped in the name of Brice, Allen & Co., were shipped on account of J. B. Myers?

"A. The books in our office will show it; I mean the letters of our office. We have no account of J. B. Myers; we do not know him except informally."

*Josiah B. Myers,* the defendant, testified, *inter alia:*

[*Myers v.* Brice *et al.*]

" I met Brice. . . . . . I told him Hobson had come to me on their account and wanted to negotiate a sale of some goods. . . . . . He said they were responsible for all he did. This was before the transaction of October 6th, 1874. Hobson, at time of first transaction, came into my place and wanted to buy goods, telling me he was buying for Brice, Allen & Co. Mr. Kauffman showed him a lot of goods in my presence. We settled on twenty cents as the price. I knew that he proposed to ship the butter. I didn't know to whom. I never heard of the firm of Watson, Dunn & Co. until a year afterwards. I said to Hobson, ' I don't want any after-claps, I must know what I am doing.' ' You will get this twenty cents sure,' he said, ' I think more. Twenty cents you have, anyhow.' ' You are sure?' I asked. ' Yes,' he replied. The next day or two afterwards I received the money at the rate of twenty cents. The bookkeeper brought me the money.

" Q. You say he guaranteed the advances he made at twenty cents?

" A. Yes, sir. The next lot he bought I told him I couldn't take twenty cents. He allowed me twenty-two cents. There was the same arrangement as before. He guaranteed the twenty-two cents in advance without reclamation at all. November 5th, 1875, I first heard of this claim for reclamation. I objected at once."

*Frank H. Kauffman*, for the defendant, testified, *inter alia:*

" The first contract was made in October, 1874. I showed him the butter. He was satisfied with the character of the goods; would make an advance of twenty cents, and guarantee it. He said there should be no drawbacks. In regard to the second transaction I was present at that sale. The terms were similar to the former except as to rate. Would advance twenty-two cents, and guarantee it."

*Thomas Kahoe*, for the defendant, testified, *inter alia:*

" I was bookkeeper for the defendant in 1874."

The following bills of sale shown witness:

" ALL CLAIMS MUST BE MADE WITHIN THREE DAYS' TIME.

PHILADELPHIA, October 6th, 1874.

MESSRS. BRICE, ALLEN & Co.

Bought of J. B. MYERS,
Wholesale Commission Merchant,
Nos. 32 and 34 South Water Street,

20 kegs butter   .   •   •   •   •   •   •
8 firkins butter .   •   •   •   •   •   •
15 tubs butter   .   ;   •   •   •   •   •

                                    $690.40

[Myers *v*. Brice *et al.*]

"ALL CLAIMS MUST BE MADE WITHIN THREE DAYS' TIME.

PHILADELPHIA, November 2d, 1874.

MESSRS. BRICE, ALLEN & Co.
        Bought of J. B. MYERS,
        Wholesale Commission Merchant,
            Nos. 32 and 34 South Water Street,

| | |
|---|---:|
| 57 tubs butter . . . . . . . | $638.66 |
| 15 kegs butter . . . . . . . | 325.82 |
| | $964.48 |

" These are exact copies of the bills for the butter in question purchased by Hobson. I took the bills, of which these are copies, to Brice, Allen & Co., before I received the checks on each transaction. I left them at their store with a clerk, one of these two certainly. The other I can't speak positively about. I don't know which one I rendered, but I presented one of them, I am certain."

After failure of plaintiffs to produce the originals on call, counsel for defendant offered the copies in evidence.

The offer was objected to, because it was not proved which one was rendered.

The objection was sustained under exception. (Fifth assignment of error.)

The witness produced a book, and continued:

"This is defendant's book of original entries kept by me. These books contain entries and charges of the goods in question against Brice, Allen & Co. These bills of sale are exact copies from the books."

Counsel for defendant offered the book in evidence.

Objected to, and the objection sustained under exception. (Sixth assignment of error.)

The receipt of October 7th, 1874, was shown the witness.

"Q. Had you any authority from the defendant to sign the receipt in that way for advances?"

Objected to, and the objection sustained under exception. (Seventh assignment of error.)

"This receipt was written by me under direction of Mr. Shoester. I objected to sign it the way it now stands. I first wrote the word purchase. Mr. Shoester directed me to strike out that word. He insisted on having the word purchase stricken out. I raised objections, still I signed it. All that I had to do was to see that the amount I received corresponded with the amount charged on my books."

*Frederick M. Allen* being called for the defendant, counsel proposed to prove:

[Myers *v.* Brice *et al.*]

That in November, 1875, Thomas Hobson, the agent of plaintiffs, called by them as a witness in this case, told the witness, Frederick M. Allen, shipping clerk for plaintiffs, that in 1874 he had bought butter to ship to Europe, and had guaranteed price, and that account sales with a heavy loss, less than the price guaranteed, had come in, and that said Hobson said to said Allen: "Now, I have to go to these parties whom I bought butter off of and buy more, in order that we may be in their debt, for if we don't, we will never get a cent of drawback, and we will have to settle the loss ourselves." And that said Allen asked said Hobson if he did not think that was a sharp trick, and that the said Hobson replied: "Yes, but it would work." And to prove further, that the said Hobson told witness that the defendant was among those to whom he had guaranteed the amount advanced. To be followed by proof that more butter was bought from Myers about that time, namely, to the amount of $281, claimed as a set-off in this case.

The offer was objected to, and the objection was sustained, except as to the single question, whether Hobson said he had guaranteed prices to any one.

Exception for defendant. (Eighth assignment of error.)

The witness:

"Hobson told me that he had guaranteed advances made to J. B. Myers."

*J. B. Myers*, the defendant, recalled.

"I knew nothing of the two receipts of October 7th and November 4th, 1874, until . . . November, 1875. . . . Mr. Shoester showed them to me."

"Q. Did you then and there reject and repudiate them? What did you say?"

Objected to, and objection sustained under exception. (Ninth assignment of error.)

Counsel for defendant asked the Court to charge, *inter alia:*

2. That if the jury believe that plaintiffs neglected for an unreasonable time to give defendant notice of loss on sales, and of Watson, Dunn & Co.'s delay in selling, which justified the defendant in concluding that the butter had been disposed of without loss, the plaintiffs cannot recover, even if the price paid had been subject to reclamation.

3. That an agent or factor is liable for any loss arising from his neglect to keep his principal informed. The burden of proving extent of loss is upon the plaintiffs, and if the jury believe that the plaintiffs neglected for a whole year to communicate with defendant as to operations of Watson, Dunn & Co., they became insurers for amount advanced, and cannot

[Myers *v.* Brice *et al.*]

recover in this suit. And this is the law, even if plaintiffs were originally entitled to make reclamation.

The Court refused these points, and charged the jury, *inter alia,* " that the plaintiffs did not become insurers of the amount advanced for nearly nine months of loss on English shipment, for the reason that, in this case, it was the duty of the defendant himself to make inquiry and inform himself as to the condition and sale of the said shipment."

The defendant excepted to the answers to the points and the charge, which constituted his tenth, eleventh, and twelfth assignments of error.

April 12th, 1880. Verdict for the plaintiff for $510$\frac{81}{100}$, upon which judgment was subsequently entered.

The defendant then took out a writ of error, assigning twelve errors as set forth *supra.*

*William D. Wetherill,* for plaintiffs in error.

The rulings covered by the first, seventh, and ninth assignments, treating the receipts as estoppels, were plainly erroneous. A party who wishes to avail himself of the acts of an agent to charge the principal, must prove the authority: Hays *v.* Lynn, 7 Watts, 524; Insurance Co. *v.* Shultz, 1 Norris, 46.

A receipt even under seal is not conclusive, and is open to explanation: Hamilton *v.* McGuire, 3 S. & R., 355; Horton's Appeal, 2 Wright, 294; Berryhill's Appeal, 11 Casey, 245; Bell *v.* Bell, 2 Jones, 235.

They were written in direct contradiction of the contract, under protest by the bookkeeper, and without notice to the defendant. They were obtained by fraud and misrepresentation. The Court, in excluding proof of no authority, decided that an agent sent merely to collect money can entirely change the original contract and conclusively bind his principal.

*Second Assignment.* The questions were not asked to prove a change in the original contract, but to contradict Hobson's testimony, and to show what the contract originally was by showing what a different account Hobson gave of it on a previous occasion: Schlater *v.* Winpenny, 25 P. F. Smith, 321; Starkie on Evidence, 214; Greenleaf on Evidence, vol. i., sec. 216

3d. Dunn's statement was: " I have such knowledge as a principal would have of his general business. The books which I keep show the details of every transaction." This is not enough to make his testimony competent.

4th. That the witness could not swear positively which one of the two bills of sale was presented, did not render

them inadmissible, as each contained, at the top, the same notice.

The book-entries were part of the *res gestæ:* Welsh *v.* Cooper, 8 Barr, 217.

They were corroborative: Welsh *v.* Speakman, 8 W. & S., 257; Eastman *v.* Bennett, 6 Wis., 232.

5th. If there had been a right of reclamation of any loss, then delay in giving notice of it made plaintiffs insurers of the amount advanced. It was unreasonable, and justified the defendants in concluding the butter had been sold without loss: Harvey *v.* Turner, 4 Rawle, 222; Arrott *v.* Brown, 6 Wharton, 9; Brown *v.* Arrott, 6 W. & S., 402.

*Benjamin F. Tolson, Henry B. Freeman,* and *Charles D. Freeman,* for defendants in error.

Kahoe was the general agent and business manager for the defendant. The acts of the agent, within the general scope of the business with which he is intrusted, bind the principal, although the specific act may be in excess of his instructions: Express Company *v.* Schlessinger, 25 P. F. Smith, 247; Tanner *v.* Oil Creek Railroad Company, 3 P. F. Smith, 411; Hatch *v.* Taylor, 10 N. H., 538; Barber *v.* Britton, 26 Vermont, 112.

Knowledge of the agent is knowledge of the principal, if he acquired it in the same transaction: Hood *v.* Fahnestock, 8 Watts, 489; Bracken *v.* Miller, 4 W. & S., 111.

The first question asked Hobson was not cross-examination, and, if offered for contradiction, no time or place was stated, and it was inadmissible: 1 Greenleaf on Ev., sec. 216; Starkie on Ev., 214.

The other question was properly ruled out, on the ground that nothing Hobson could do or say could change the contract.

The bills of sale were not identified. The books were not competent, because since the Act of 1869 they are not the best evidence.

May 1st, 1882.—The decision of the Court was delivered by GREEN, J.

There is no merit whatever in the first assignment of error. Certainly, the Court should not have rejected the receipts on the assumption that Kahoe, the agent, had no authority to sign them. Admittedly, Kahoe was the agent of the defendant, sent by him to the plaintiffs for the transaction of this particular business. He did receive the money, which was accepted and retained by the defendant. The money was paid by the plaintiffs upon account of the trans-

[Myers *v.* Brice *et al.*]

action in question, and the selected agent of the defendant having full power to receive the money, and, in the transaction, gave receipts for it in the name of his principal at the times it was paid. Upon no principle would it have been proper to absolutely reject them. The objection that proof was not first given by the plaintiff that the defendants' agent had express authority to sign receipts, containing the matter appearing on the face of these papers, has no weight. In actual fact, he did sign them, and the plaintiffs were entitled to the benefit of that fact. Of course, they were not conclusive upon the defendant. If the contract between the parties was a sale, and not a consignment, the defendant was at perfect liberty to prove it, notwithstanding the receipts. He did give such testimony by himself and other witnesses without any objection, and the case went to the jury mainly on that question.

*Second Assignment.*—The question, put to Hobson and rejected, on cross-examination, was not cross-examination, and was entirely immaterial. It could not have affected the case, whether he answered it affirmatively or negatively, and was subsequently contradicted. It did not, and could not illustrate the question,—what was the actual contract between these parties?

The same is true of the question rejected under the third assignment.

*Fourth Assignment.*—The witness, Dunn, testified positively to the receipt of butter from the plaintiffs, giving dates and particulars of the shipments. He nowhere said that his knowledge on this subject was derived from hearsay. What he said about his understanding that the butter was the property of Myers, was rejected from the deposition by the Court on the objection of defendants' counsel.

*Fifth and Sixth Assignments.*—The defendant offered in evidence two papers, purporting to be bills of sale of the butter in question by the defendant to the plaintiffs. To make them admissible, he called Kahoe, his bookkeeper, who testified that he took bills, of which they were copies, to the plaintiffs' store, before the checks were given, and left them with a clerk. He immediately added, however, that he took one of them, but did not know which. He did not name the clerk with whom he left the bill. The defendant then called upon the plaintiffs to produce the bills, and they responded by testifying, together with Hobson and Shoester, the latter of whom had taken the receipts, that they knew nothing of such bills, and had never seen or heard of them. Then the defendant offered the two bills in evidence, which were very properly rejected. The offer was a unit of both

bills.    But the testimony in support of the offer was that only one of them was left, and which one, that the witness could not state.    In no view of the case were the two bills admissible, and therefore, there was no error in rejecting the offer as made.

As to the defendant's books of account, they were not the best evidence of the particular matter in controversy, and, therefore, not admissible.    The question at issue was, whether the contract between the parties was a sale or a consignment ?    The defendant was a competent witness, and could prove by his own testimony, and by that of any other person having knowledge, what the contract was.    All this he did.    Had he not been a competent witness, the case would have been quite different.    It might well be, that in such a situation the book-entries would have been competent from the necessity of the case.    But, as he was competent, and did testify, the necessity of introducing evidence of a secondary character no longer existed.    In these circumstances, the entries are nothing but the defendant's unsworn declarations in writing of the same fact, which he could and did prove by his own oath.    The case of Welsh *v.* Cooper, 8 Barr, 217, is not applicable.    There the very question at issue was, whether a certain person was the owner of a stock of store-goods at a certain place, and it was held competent to prove that a store-business was carried on at that place by that person, and with the goods there kept.    Of course, the fact that books of account, showing sales of goods there and by that person, were constantly kept in the name of that person, was a fact proper to be proved as a part of the *res gestæ.*    The same offer of proof was proper, and for the same reason, in the case of Welsh *v.* Speakman, 8 W. & S., 257. But this does not touch the present case, or the present question.    The utmost that could be proved by these entries could be, and actually was, proved by testimony of a superior order, and, therefore, this inferior and unnecessary testimony was properly rejected.

The seventh assignment is not pressed, nor could it be with any force, as it was a proposition to prove by the agent that he had no authority to do the act which he did do, and as a consequence of which the money of the plaintiffs was paid by them and received by him.    The case of Mundorff *v.* Wickersham, 13 P. F. S., 87, goes further than this, and holds that if an agent obtains possession of the property of another by making a stipulation, or condition, which he was not authorized to make, the principal must either return the property, or, if he receives it, it must be subject to the condition upon which it was parted with by the former owner.    In the pres-

ent case, the defendant was allowed to prove by the agent all the facts which transpired when the receipts were given, and this was as far as he could go.

The eighth and ninth assignments are not pressed, and there is nothing in them. In answering the defendant's first point, the Court below defined the duty of the agent in respect of giving information to his principal of the sale of goods, and charged that a violation of this duty was negligence on the part of the agent. This was in accordance with the defendant's request, and covers all the abstract law that is contained in the second and third points. These latter points were refused, because there was no evidence that the loss on the sale of the butter was occasioned by neglect, or that any loss was incurred by the failure of the plaintiffs to keep the defendant informed, either for a whole year or for any unreasonable time. The counsel for the plaintiff in error has not pointed out to us the evidence necessary to sustain these points, and, after carefully reading the testimony, we fail to discern it. The trouble seems to have been that the butter was not sold for a long time after it was shipped, on account of the very low price which prevailed, and the absence of demand. When it was sold, it was necessarily at a loss, for which neither the plaintiffs nor the foreign consignees were responsible. When the account-sales were received by the plaintiffs does not appear, but the plaintiffs' bookkeeper, Shoester, testified that they were sent to the defendant, who retained them, shortly after they were received. The witness, Hobson, testified that he communicated constantly with the defendant from the time of shipment to the time of receipt of account, and that he kept him advised of the condition of the English market. The case was tried chiefly upon the question whether the transaction was a sale or a consignment. The evidence was conflicting, but the jury have determined, and upon sufficient testimony, that it was a consignment. As we see no error in the record,

       The judgment is affirmed.

SHARSWOOD, C. J., and TRUNKEY, J., dissent.